IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, ) | CR 16-01836-TUC-DCB (EJM) |
| Plaintiff, ) | |
| vs. ) | **REPORT AND RECOMMENDATION** |
| ) | |
| Celina Facio Wesley, ) | |
| Defendant. ) | |

Pending before the Court is the defendant's motion to suppress her statements made to law enforcement. The defendant first argues that her statements should be suppressed because they were obtained in violation of *Miranda*. Alternatively, the defendant argues that even if *Miranda* was not violated, her statements were not voluntary. For the reasons discussed below, the Court finds that the defendant was not in custody so there was no *Miranda* violation, and that the totality of the circumstances surrounding the defendant's interview establish that her statements were voluntary. Accordingly, it is recommended that the motion to suppress be denied.

**FACTUAL BACKGROUND**

On September 28, 2016, a federal grand jury in Tucson, Arizona returned a two-count indictment charging the defendant, Celina Facio Wesley, with making false statements in connection with the purchase of two firearms. As will become evident below, these federal charges are the direct result of the challenged statements made by the defendant to a Tucson Police Department Detective who was investigating a homicide. On December 2, 2016, the defendant appeared pursuant to summons for her Initial Appearance and Arraignment. The defendant remained out of custody under the supervision of Pretrial Services and a trial date

was set.

On October 3, 2017, the defendant filed the instant motion to suppress statements made to law enforcement on April 7, 2016. (Doc. 43.) The defendant argues that her statement should be suppressed because she was in custody and interrogated by law enforcement, but never advised of her *Miranda* rights prior to or during the interview. Alternatively, the defendant argues that even if *Miranda* was not violated, her statements should be suppressed because they were the product of coercion, and therefore, not voluntary.

The government filed its response on October 17, 2017. (Doc. 44.) The government argues that the defendant was not in custody during this consensual interview, so *Miranda* warnings were not required. The government also argues that the totality of the circumstances surrounding the interview demonstrate that the defendant's statements were voluntarily because she agreed to the interview, never requested to terminate the interview, and her will was not overborne by any physical intimidation or psychological pressure by law enforcement prior to or during the interview.

An evidentiary hearing on the motion to suppress was held on November 8, 2017. The government called one witness: Tucson Police Department ("TPD") Detective Joshua Cheek. Detective Cheek began by explaining that he was involved in a murder investigation that ultimately led to the interview of the defendant. (Tr. at 6.)[1] Detective Cheek testified that the defendant was never a suspect in the murder investigation; she was considered a witness. (*Id*.) Detective Cheek was assigned to investigate a homicide that occurred in March 2016 in the parking lot of the Super Target at Oracle and Roger in Tucson, Arizona. (*Id*. at 7.) A passerby found a deceased male who had been shot. (*Id*.) TPD Officers responded and found baggies of drugs in the parking lot and a blood trail from where the shooting had occurred to the decedent's body. (*Id*.) Officers also found a cell phone that

---

[1] Citations to "Tr." followed by the page number are to the transcript of the motion hearing held on 11/8/17.

belonged to the victim. Officers analyzed the cell phone and discovered recent text messages and communications with a person named Maurice Patterson.

Detective Cheek explained that as TPD was conducting the investigation, an individual named Maurice Carter called TPD and provided information about the murder. (*Id.* at 8.) Carter advised the TPD that the defendant told him that her boyfriend, Maurice Patterson, had an altercation or confrontation with a male at the Target parking lot and was involved in a shooting. (*Id.*) The defendant also told Carter that Patterson poured bleach over the gun, dismantled the gun, and disposed of the gun in different locations throughout town. (*Id.*)

TPD officers were able to locate an address for the defendant's parents. On April 7, 2016, officers went to that residence. (*Id.* at 8.) The vehicle that was parked at the residence matched the vehicle in the surveillance video from the Target parking lot. (*Id.* at 8-9.) Detective Cheek had officers remain at the residence and conduct surveillance. (*Id.* at 9.) When the vehicle left the residence, officers followed the vehicle to a Quik Trip located at 22nd Street and Pantano. (*Id.*) When the vehicle stopped at the Quik Trip, officers approached the vehicle. (*Id.*) Maurice Carter and the defendant were in the vehicle, as well as the defendant's two young children. (*Id.* at 9, 14.) Detective Cheek does not recall how many officers were at the Quik Trip, but there were several plain-clothes officers. (*Id.* at 10.)

Detective Cheek testified that he wanted to contact Carter and the defendant to see if they would be willing to give statements about the homicide; specifically, what Carter had learned about the incident from the defendant and what the defendant had observed and learned about the incident from Patterson. (*Id.* at 9.) Again, Detective Cheek viewed both the defendant and Carter as potential witnesses. (*Id.*)

Detective Cheek described the defendant and Carter as very cooperative. (*Id.* at 12.) After identifying himself, Detective Cheek explained that he wanted to talk to them about an incident that TPD was investigating. At this point, Mr. Carter pulled Detective Cheek aside to talk privately. (*Id.*) Mr. Carter asked if they could talk "someplace more private" because "the individual that we were looking for lived in the area and [Carter] didn't want

1 for that person to come by and see them talking to police." (*Id.*) As a result of Carter's
2 concern, Detective Cheek asked Carter and the defendant if they were willing to come down
3 to the police station to talk. (*Id.* at 12-13.) Detective Cheek does not recall if the defendant
4 had the same concern as Carter, but both the defendant and Carter said that they were willing
5 to ride down to the police station to talk. (*Id.* at 13-14.) Detective Cheek made clear that
6 neither the defendant nor Carter were hesitant to speak with TPD officers or come down to
7 the station to do that. (*Id.* at 14.)

Because the defendant's children were with her, Detective Cheek asked if a family member could pick up the children while officers spoke with the defendant and Carter. (*Id.*) Detective Cheek explained that he obviously was not going to leave the children unattended at the Quik Trip and did not think a police station was "the ideal place for young kids to hang out." (*Id.* at 15.) The defendant's mother came to pick up the children. (*Id.* at 16.) The defendant's car was towed from the Quik Trip to the police station because officers were going to obtain a search warrant for the vehicle, regardless of whether the defendant agreed to an interview. (*Id.* at 40.) The defendant and Carter were driven to the police station in different vehicles. (*Id.*) Neither were handcuffed. (*Id.*) Detective Cheek explained that he did not consider either the defendant or Carter to be a suspect and was not considering charging either with a crime. (*Id.* at 15.) Thus, he had no intention of taking either into custody, nor did he threaten or imply that to the defendant or Carter. (*Id.* at 15.)

At the police station, the defendant and Carter were placed into separate interview rooms. (*Id.* at 17.) Detective Cheek explained that he wanted to conduct separate interviews to ensure that one person's statement did not influence the other person and to ensure the most accurate information from both people. (*Id.*) The defendant was not handcuffed while in the interview room. (*Id.*) Detective Cheek explained that the door to the defendant's interview room was initially open, but the door was closed when the interview with Carter was occurring directly across the hallway. (*Id.*) The doors to the interview rooms lock from the outside when closed, but the defendant never knocked on the door or asked to leave the room. (*Id.* at 21, 63.)

At the beginning of her interview, the defendant did not seem distressed or distraught; rather, she was calm and cooperative. (*Id*. at 18.) Detective Cheek testified that he never read the defendant her *Miranda* rights because he was talking to her as a witness, she was not under arrest, and she was going home regardless of whether she spoke with law enforcement. (*Id*. at 48, 61.) The defendant never requested to terminate the interview or leave the station. (*Id*. at 18, 21.) Detective Cheek testified that had she done so, he would have ended the interview and arranged to get her home. (*Id*.) He explained that the defendant "had agreed to come down" and "talk with us" and if she had changed her mind and asked to go home, they would have had to honor that request because "there was nothing that we were going to be arresting her for." (*Id*.)

Detective Cheek testified that the focus of his interview with the defendant was on any information that she had received after the homicide or anything she observed around the time of the homicide or after the homicide in regards to Patterson. (*Id*. at 19.) Detective Cheek told the defendant that he had a suspect in the homicide, but he did not refer to the name of the suspect. (*Id*. at 19.) He did not insinuate that the defendant was a suspect in either the homicide or something other than the homicide. (*Id*. at 20.)

The defendant became emotional during the interview when Detective Cheek showed her a picture of Patterson. (*Id*. at 21-22.) Up until that point, the defendant had not given the name of her boyfriend. (*Id*. at 22.) Detective Cheek explained that the defendant became emotional out of a concern for Patterson; specifically, that law enforcement "actually knew the individual that we were talking about." (*Id*.) Detective Cheek asked the defendant to sign the back of the photograph. (*Id*. at 27.) The defendant said that she did not want to sign it and did not sign it. (*Id*.) Detective Cheek brought the defendant water and tissues, and they took a break so the defendant could compose herself. (*Id*. at 22.)

Detective Cheek testified that they did not have a murder weapon and he wanted to get information on the firearm used during the homicide. (*Id*. at 23.) Specifically, he wanted to get as much information about the murder weapon in order to either locate it, find out where it was purchased, and/or determine what kind of weapon it was in order to build

the homicide case. (*Id*. at 23-24.) The defendant told Detective Cheek that she purchased two guns for Patterson. (*Id*. at 24.) On cross-examination, defense counsel questioned Detective Cheek about the need to find out who purchased the gun for Patterson. The import of that questioning was that Detective Cheek did not need to know that the defendant purchased the gun for Patterson, and that he only sought that information to incriminate the defendant. Detective Cheek explained that how Patterson obtained the gun used in the murder was important to his homicide investigation because Patterson was a prohibited possessor - *i.e*, he could not lawfully buy or possess firearms. (*Id*. at 24.) Detective Cheek testified that he was not looking to charge the defendant for purchasing the firearms (nor could he because it was a federal offense); again, he was trying to get as much truthful information as possible to aid in the murder investigation given the lack of a weapon and witnesses to the murder. (*Id*. at 25.)

At the conclusion of the interview, Detective Cheek reiterated that the defendant was just a witness. (*Id*. at 26.) He wanted to put the defendant at ease because she was really upset when she saw the photograph of Patterson. (*Id*.) Detective Cheek told the defendant she was going to go home and made sure she had a ride home. (*Id*.) Detective Cheek walked the defendant out to her mom's car. (*Id*.) During the walk to the car, Detective Cheek told the defendant "she would do well to stay away from" Patterson, and she assured him that she would steer clear of Patterson. (*Id*. at 27.)

Detective Cheek testified that he did not pressure the defendant to submit to the interview, nor did he believe she felt pressured during the interview. (*Id*. at 28.) He again explained that the defendant became emotional when shown Patterson's picture, but she refused to sign the photograph and he did not pressure her to do so. (*Id*. at 27.) Detective Cheek did not feel like the defendant was hesitant to speak with him, but he did feel like she minimized her knowledge during the first portion of the interview. (*Id*. at 28.) Specifically, her involvement in going around town with Patterson to dispose of the gun. (*Id*.) Detective Cheek testified that he did not pressure the defendant to stop minimizing or threaten her to get her to provide more information. (*Id*.) He testified the defendant was more forthcoming

with information after being shown Patterson's photograph. (*Id.*)

Detective Cheek testified that he did not suggest to the defendant that she could get in trouble for purchasing the gun for Patterson. (*Id.* at 29.) Nor did he immediately call ATF after the interview and report the defendant's gun purchases for Patterson. (*Id.* at 30-31.) Detective Cheek explained that pursuant to TPD's standard practice, he gave ATF copies of his reports long after the interview (weeks or months) once Patterson was arrested and charged with murder. (*Id.* at 30-31, 56.)

The defendant testified that on April 7, 2016, she was pulled over by law enforcement. (*Id.* at 78.) She estimates that there were seven to eight police officers at the Quik Trip where she stopped her vehicle. (*Id.* at 78-79.) These officers were in unmarked police cars. (*Id.* at 79.) She testified that the officers asked her if she would be willing to answer some questions. (*Id.* at 80.) Specifically, she testified: "[t]hey just said they wanted to just ask us some previous questions. . .they kept telling me, you're fine, we just want to ask you a couple of questions and whatnot." (*Id.*) The defendant admitted that she did tell the officers that "I can answer some questions." (*Id.*). However, she testified that she did not anticipate going to the police station to answer the questions – "I just told them I would answer some questions. I didn't indicate what the location would be." (*Id.*) She never discussed going back to the police station with Mr. Carter. (*Id.*) She testified that the police never told her that she did not have to go with them, and she did not feel like she could decide not to go to the station with them. (*Id.* at 81-82.) She left with officers before her mother arrived to get her children. (*Id.* at 88.) At the time she left with the officers, she did not know that her car was going to be towed. (*Id.* at 81.)

At the station, she was placed in an interview room and waited for about 25 to 30 minutes before being interviewed. (*Id.* at 82.) She testified that at the beginning of the interview, Detective Cheek never told her that she was not a suspect. (*Id.* at 85.) In fact, she was concerned that she may be a suspect in a crime and/or charged with a crime. (*Id.* at 83.) She was also concerned about losing her children to Child Protective Services; her testimony implied that Detective Cheek referred to that possibility. (*Id.* at 83-84.) The defendant

admitted that she refused to sign the back of Patterson's picture. (*Id*. at 87.) She also admitted that at the end of the interview, Detective Cheek suggested that she stay away from Patterson. (*Id*. at 88.) However, on cross-examination she admitted that she did have contact with Patterson after the interview. (*Id*. at 88.)

An audio recording of the defendant's interview with Detective Cheek was admitted into evidence. (Ex. 1.) The recording reflects two interview sessions with the defendant on April 7, 2016. The first interview ended when the defendant became emotional after being shown Patterson's picture. Other than this display of emotion, the defendant's tone is calm, she is composed, and she is soft-spoken. She never asks Detective Cheek if she is going to get in trouble or expresses any concern about whether she will be able to go home after the interview. By contrast, she asks several times if Patterson is going to get in trouble and go away for a long time. She never asks to terminate the interview and never questions whether she has to continue to speak with Detective Cheek.

Detective Cheek's tone throughout the interview is calm. His interview style is not heavy-handed; he makes no threats or promises. The focus of this interview is on Patterson and the defendant's knowledge of his involvement in the murder. He repeatedly assures the defendant that all he wants to learn is the truth of what happened and what the defendant knows about the shooting. He does press her on certain areas when he thinks she may be minimizing what she knows. But, again, his tone never changes, and he does not use threats, pressure, or intimidation. At most, he encourages the defendant to tell the truth because Patterson is not worthy of her protection and is not a good guy. At the conclusion of the interview, he mentions that the defendant agreed to come to the station to speak with him, and that no one has threatened or promised her anything. The defendant acknowledges and never disputes any of Detective Cheek's statements regarding the circumstances of the interview.

## **DISCUSSION**

**A.** *Miranda* **Violation**

The Fifth Amendment of the United States Constitution prevents the government from

- 8 -

using "statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). As a result, whenever a person is in custody, she must be advised of her right to remain silent and her right to the presence of an attorney prior to commencing interrogation. *Miranda*, 384 U.S. at 444.

"Custody" for purposes of *Miranda* "is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 132 S. Ct. 1181, 1189 (2012). Even when a formal arrest has not occurred, a person may be in custody for purposes of *Miranda* if her freedom of movement is restrained to "the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (*per curiam*). That said, the question is whether the setting in which the questioning occurred is one "from which a reasonable person would believe that he or she was not free to leave." *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987). Accordingly, in determining whether a person is in custody, a court must focus on the objective circumstances of the questioning rather than the subjective views of the suspect or the officers. *Stansbury v. California*, 511 U.S. 318, 322 (1994). In conducting this objective or reasonable person inquiry, a court examines: (1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual. *Beraun-Panez*, 812 F.2d at 580.

Absent an actual arrest, there is no one fact that is determinative of when a person is in custody. To be sure, questioning at a police station will typically be more custodial in nature than at a more neutral location. *Orozco v. Texas*, 394 U.S. 324, 326-327 (1969). Likewise, officers' efforts to remove a suspect's only means of egress from the scene of the interrogation may indicate that the person was in custody. *Berkemer v. McCarty*, 468 U.S. 420, 437-438 (1984). However, handcuffing a suspect does not necessarily dictate a finding that the suspect was in custody. *United States v. Cervantes-Flores*, 421 F.3d 825, 830 (9th Cir. 2005). Thus, the analysis of whether a person was in custody is a fact-specific inquiry

using the factors mentioned above. The Court finds that each factor establishes that the defendant was not in custody when being questioned by law enforcement, and therefore, *Miranda* warnings were not required.

**1. The Language Used to Summon the Individual.**

In the case at hand, the Court must look not only to the language used to summon the defendant but also the circumstances that led to the summoning. At first blush, the surveillance of the defendant, the traffic stop of her vehicle, and the location of the interview would seem to support the argument that the defendant was in custody when interviewed. It is clear that TPD officers did not want to lose track of the defendant once they found out where she was living and desperately wanted to speak with her and Mr. Carter regarding their murder investigation. The law enforcement tactics used here are commonly used to arrest a suspect of a crime. However, those tactics alone do not demonstrate that the defendant was in custody at the time of her interview. TPD was actively investigating a murder that occurred weeks earlier and had credible information that the defendant had valuable information about the assailant. The reality of the situation was that officers simply could not have left a business card in the defendant's front door, asked her to contact them, and hope that she would do so. Given the close relationship between the defendant and Patterson, it makes sense that law enforcement used some shock and awe to arrange a meeting with the defendant. Stated another way, law enforcement wanted to try to speak with the defendant before she had time to contact Patterson and/or get cold feet about speaking with law enforcement. But, as discussed below, given the communications between Detective Cheek and the defendant about whether she would be willing to speak with law enforcement, the tactics used to make contact with the defendant do not establish that she was in custody at the time of her interview.

Turning now to the language used to summon the defendant to the interview, the evidence is clear that officers asked the defendant if she would speak with them and she agreed to do so. Detective Cheek testified that the defendant agreed to speak with him, and the defendant also testified that she agreed to speak with law enforcement. The defendant

disputes that she agreed to speak with the officers at the police station, as opposed to at the Quik Trip. But the defendant did not testify that she told officers that she would only speak with them at the Quik Trip. In fact, she called her mother so she could come get her grandchildren. Moreover, the interview at the police station occurred at the request of Mr. Carter, not the officers. Carter was concerned because Patterson lived near the Quik Trip and Carter did not want him to see "them" (he and the defendant) talking with police officers. Importantly, the defendant knew details about the murder because Patterson told her; by contrast, there was no indication that Patterson was aware that Carter knew anything about the murder. Thus, Carter's concern about Patterson seeing "them" talking to the police was more acute as to the defendant, and not Carter. While officers certainly could have asked the defendant if she had the same concern as Carter, their failure to do so does not render the interview custodial.

The defendant also testified that she did not feel she could not go with the officers and thought she was a suspect in a crime and would be charged with a crime. However, during the interview at the police station, the defendant never questioned why the interview was being conducted at the station, never asked to end the interview or asked if she could end the interview, and never asked if she was in trouble. Indeed, her concern was whether Patterson was in trouble. If the defendant did not want to be interviewed at the station, wanted to end the interview, or was concerned that she was a suspect, she surely would have said one of those things during the recorded interview. Her failure to do so supports Detective Cheek's testimony that the interview was consensual, and not a custodial interrogation.

**2. The Extent to Which the Defendant is Confronted with Evidence of Guilt.**

The entire focus of the interview with the defendant was Patterson's involvement in the murder at the Target. Detective Cheek never accused the defendant of doing anything illegal; he viewed the defendant as a witness and communicated that to her. Detective Cheek never insinuated that he thought the defendant was present when the murder occurred, assisted in the destruction of the gun, or was in any way involved in the drug deal that led to the murder. In fact, he told her that he did not think she did anything wrong. Moreover,

- 11 -

when the defendant told Detective Cheek that she bought Patterson a gun but did not know he would use it to kill someone, Detective Cheek told her that he knew she didn't know that.

The defendant clearly incriminated herself when she said that she bought the guns for Patterson. But Detective Cheek testified that he did not know how Patterson obtained the gun used in the murder prior to talking with the defendant. All he knew is that Patterson was a prohibited possessor and needed to find out how he was able to obtain a firearm. Thus, Detective Cheek was not merely confirming information he already knew to extract a confession from the defendant. In fact, Detective Cheek never threatened or insinuated that he would ask federal authorities to file criminal charges against the defendant for buying the guns in order to get leverage against her to cooperate against Patterson. At most, Detective Cheek told the defendant that Patterson was a bad guy who had put her in a difficult spot and who was not worthy of her protection. Those comments do not amount to confronting the defendant with evidence of guilt of anything.

### 3. The Physical Surroundings of the Interrogation, Degree of Pressure to Detain, and the Length of Detention.

Clearly, the interview occurring at the police station is the defense's best evidence that the defendant was in custody. But, again, the interview occurred at the station at the request of Mr. Carter, not the officers. Mr. Carter initially called TPD because he was concerned for the defendant's safety (and presumably their child's safety) given what she told Carter about Patterson's involvement in the murder. The defendant never told the officers that she only wanted to be interviewed in the parking lot at the Quik Trip. As discussed above, the officers can hardly be faulted for failing to confirm with the defendant that she was indeed concerned about Patterson and would also prefer to be interviewed at the station. Indeed, the fact that the defendant told Carter about Patterson's shooting a man is evidence that she was concerned about Patterson. Thus, the officers err on the side of caution and conducting the interview at the police station does not support an argument that the interview was custodial given Carter's concern and the defendant's likely similar concern.

Additionally, the defendant was not handcuffed on the ride to the station or at the

- 12 -

station either before, during, or after her interview. The interview room door was left open until the interview of Mr. Carter started. Although the defendant was locked in the interview room once the door was closed, she never knocked on the door to ask if she could leave the room. Nor did she ever ask to end the interview or even question whether she had to continue to speak with Detective Cheek given her purported desire to only conduct the interview in the Quik Trip parking lot.

Finally, the defendant's purported "detention" at the police station was fairly minimal. She estimates that she waited in the interview room for 25-30 minutes prior to her interview. Her interview lasted about two hours, including a break. The defendant never complained about the delay in starting her interview or the length of her interview. Thus, the duration of time that the defendant was at the police station also does not support a finding that she was in custody.

The aforementioned facts establish that the defendant was not in custody during her interview with Detective Cheek, and therefore, there was no *Miranda* violation. Accordingly, the Court recommends that the motion to suppress on that ground be denied.

**B.  Voluntariness**

The voluntariness of a statement must be independently determined regardless of whether law enforcement complied with *Miranda*. *Withrow v. Williams*, 507 U.S. 680, 693-694 (1993). Even if *Miranda* warnings were properly given to a defendant who is in custody, or were not required for a defendant who was not in custody, a statement can still be involuntary if a person's "will was overborne in such a way as to render his confession a product of coercion." *Arizona v. Fulminate*, 499 U.S. 279, 288 (1991). A statement is involuntary if, under the totality of the circumstances, it was coerced by physical intimidation or psychological pressure. *See*, *United States v. Haswood*, 350 F.3d 1024, 1027 (9th Cir. 2003); *United States v. Miller*, 984 F.2d 1028, 1030 (9th Cir. 1993).

The defense points to the interview occurring at the police station, the failure to advise the defendant of her *Miranda* rights, the towing of her car, and the arrangements made for her mother to pick up the children as evidence of coercion. The defense also argues that the

defendant's young age, lack of experience with the criminal justice system, and lack of education contributed to the coercive environment that led her to make statements she would have not otherwise made.

As discussed earlier, the interview occurred at the police station given the concern expressed by Mr. Carter, and the defendant was not in custody so *Miranda* rights were not necessary. Again, the defendant testified that she told the officers she was willing to speak with them. However, importantly, the defendant did not testify that she told the officers that: (1) she would only speak with them at the Quik Trip; (2) she was unwilling to go to the station; (3) she wanted to end the interview; or (4) that she was concerned that she may be in trouble. Detective Cheek testified that the car was going to be towed regardless of whether the defendant agreed to speak with law enforcement because officers were going to obtain a search warrant for the vehicle. And if officers wanted to be coercive, they would not have arranged for the grandmother to pick up the children; rather, they would have either taken the children to the station or perhaps even called CPS. Finally, the defendant's young age, lack of education, and lack of experience with the criminal justice system are commonplace and not so unusual to render the interview coercive. All of these facts demonstrate that the interview was voluntary.

Finally, the recorded interview demonstrates that the defendant's statements were not the product of physical intimidation or psychological pressure. Nothing in the recorded interview demonstrates that Detective Cheek used intimidation or pressure to obtain the defendant's statement. He was calm and non-confrontational. He took a break and got the defendant water and tissues when she became emotional after being shown Patterson's photograph. Moreover, he made no effort to force the defendant to sign the back of the photograph after she refused to do so. In fact, if the defendant's will was overborne by the manner of Detective Cheek's questioning, she presumably would have signed the back of the photograph. She stood her ground on that point which demonstrates that she could have stood her ground on either refusing to be interviewed, ending the interview, and/or demanding to know if she was going to get in trouble. She did none of those things during

| | |
|---|---|
| 1 | the recorded interview. Finally, at the conclusion of the interview, Detective Cheek asked |
| 2 | the defendant if her statements were true and voluntary, and she acknowledged that was |
| 3 | accurate. He also verified that no one had threatened or made promises to her, and she |
| 4 | confirmed that was correct as well. |
| 5 | Based on the facts discussed above, the Court concludes that the totality of |
| 6 | circumstances establish that the defendant's statements were voluntary, and therefore, |
| 7 | recommends that the motion to suppress on this ground be denied as well. |
| 8 | Pursuant to 28 U.S.C. § 636(b) and Rule 59(b)(2) of the Federal Rules of Criminal |
| 9 | Procedure, any party may serve and file written objections within fourteen (14) days after |
| 10 | being served with a copy of this Report and Recommendation. No reply shall be filed unless |
| 11 | leave is granted from the District Court. If objections are filed, the parties should use the |
| 12 | following case number: **CR 16-01836-TUC-DCB.** |
| 13 | Failure to file timely objections to any factual or legal determination of the Magistrate |
| 14 | Judge in accordance with Fed. R. Crim. P. 59 may result in waiver of the right of review. |
| 15 | DATED this 13th day of December, 2017. |

_(signature)_

Eric J. Markovich
United States Magistrate Judge