# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-16-01836-001-TUC-DCB (EJM) |
| Plaintiff, | **ORDER** |
| v. | |
| Celina Facio Wesley, | |
| Defendant. | |

Defendant is charged in a two count Indictment with making false statements in connection with the purchase of firearms in violation of 18 U.S.C. § 922(a)(6) and 924(a)(2). Defendant filed a Motion to Suppress incriminating statements related to the offenses. Magistrate Judge Markovich held an evidentiary hearing and issued a Report and Recommendation (R&R). He recommended this Court deny the Motion to Suppress. After a *de novo* review of the motion briefs, the transcript of record, and the audio taped statements, the Court does not adopt the R&R. The Court grants the Motion to Suppress.

During a murder investigation, Tucson Police Department, Detective Cheek, interviewed Defendant as a witness. Police had been informed that she was the girlfriend of the murder suspect; that she was with him following the murder, saw him pour bleach over the murder weapon, take it apart, and drove him around so he could dispose of the gun parts in different locations throughout town. Surveillance footage from the murder scene showed the suspect was driving her car. Police surveilled her residence, followed

1 her in an unmarked police car, and pulled her over with flashing lights at a Quick Trip
2 gas station/market. (Motion to Suppress, Transcript of Record (TR) at 78 (Wesley
3 testimony), *but see* (TR at 33) (Detective Cheek understood from the surveillance officers
4 that she stopped at the Quick Trip of her own accord). There were several plainclothes
5 officers; Detective Cheek could not recall but thought there were two or three, with
6 others being undercover (TR at 10), but Wesley reported seven or eight officers at the
7 Quick Trip (TR at 79). Detective Cheek asked her if they could ask her some questions;
8 "he kept telling [her] you're fine, we just want to ask you a couple of questions and
9 whatnot." (R&R (Doc. 55) at 80.) She agreed.

Defendant was with another person when she was stopped at the Quick Trip. He was the anonymous source that had tipped police off regarding her involvement. Police asked to interview him too. He took Detective Cheek aside and asked if the interview could be conducted in a more private place because the suspect lived in the neighborhood of the Quick Trip. (TR at 11.) Defendant was not privy to this conversation. Detective Cheek then asked the two to come to the police station for questioning. They did so. The two were separated and transported in unmarked police cars to the police station. Defendant was not hand cuffed.

Defendant testified that she agreed to answer questions, but that police did not tell her that she did not have to answer any questions or that she did not have to go to the police station to answer the questions. It is undisputed, she was not Mirandized. When the Defendant left for the police station to be questioned, she knew that she was not being allowed to drive her car there. Police told her it would remain at the Quick Trip while she was answering questions at the police station. In fact, police intended to obtain a warrant for it to be towed and searched, regardless of whether Defendant agreed to answer questions based on the suspect's use of the vehicle, and this is what happened. Police allowed her to make arrangements for her mother to come pick up her two small children, who were in the car when she was stopped. She left her children with police before her mother arrived.

At the police station, Defendant was placed by herself in a formal interview room with a table where suspects could be handcuffed to it, but she was not handcuffed or otherwise restrained. The door was shut but officers periodically checked on her to bring her water, etc. Defendant waited for approximately 30 minutes while police interviewed the other person. Then they interviewed her. About half way through the interview, Detective Cheek asked her if she knew where the suspect obtained the gun used in the murder. Detective Cheek was "kind of surprised," (TR at 69), when she admitted the gun was hers. In response to further questioning (approximately 10-15 minutes), she admitted she bought the gun for the suspect for him to protect himself because he could not buy a gun because he was a convicted felon. Detective Cheek surmised this purchase was probably not the only time she had bought him a gun, and she admitted to having previously purchased another gun for him. Subsequently, the Tucson Police turned this information over to ATF. The federal firearm charges are based on these two admissions and the corresponding Form 4473s, where she allegedly falsely stated she was the actual buyer. The statements are the subject of the Motion to Suppress.

At the suppression hearing, Detective Cheek explained that he asked Defendant questions about the gun because the suspect was a convicted felon, who could not buy a gun, and Detective Cheek wanted to establish that the suspect had access to a gun and what type of gun. This was important to confirm the suspect was the shooter by matching forensic evidence from the murder scene to a gun in the suspect's possession. Detective Cheek was also trying to establish the element of premeditation so information about when and why the gun was purchased was relevant. Detective Cheek testified that Defendant was the key witness in the state case because her purchase information connected the suspect to the type of gun used in the murder.

It is abundantly clear from reviewing both the transcript from the motion hearing and the audio recording of Detective Cheek's interview with the Defendant that he considered her a witness in his case and not a suspect. He clearly intended to use her as such. It is also clear that she was concerned about her own criminal liability. She asks

several times whether or not she is in trouble, including expressly asking if she is in trouble for buying the suspect the gun. She says she did not know he would kill someone. Detective Cheek assures her that he believes her, and he is only questioning her as a witness, a cooperating witness to the murder. While Detective Cheek justifies his questions as all relevant to his murder investigation, he has no such justification for his questions related to other guns purchased by the Defendant not related to the murder. Detective Cheek admitted to knowing that the Defendant was making incriminating statements. (TR at 58-59.)

The Magistrate Judge found there was no duress: Detective Cheek was very nice, polite, and sympathetic. Defendant was asked to cooperate and she did. This is true, but it ignores that Detective Cheek knew the Defendant might have potentially incriminating evidence; she was with the suspect following the murder and helped him dispose of the weapon. The Court finds that Detective Cheek, an experienced law enforcement officer, did not Mirandize the Defendant because he decided to use her as a witness in the murder case. The Court's concern is that the assurances given to her by Detective Cheek that she was not in trouble and was only being questioned as a witness induced her to incriminate herself.

It is not an issue of whether any promise by Detective Cheek, a state agent, is binding on the federal prosecutor: clearly, it is not. Here, the question is one of fundamental fairness. This doctrine may operate to require dismissal, if a defendant's reliance on a promise subjects him to subsequent prosecution or other related detriment. *Cf., State v. Bryant*, 42 P.3d 1278, 1285–86 (Wash.2002) (finding, even though Snohomish County was not bound by immunity agreement defendant reached with King County, immunity agreement would be enforced and Snohomish County charges dismissed where the defendant's incriminating statements made in reliance on the agreement led to subsequent prosecution); *Ramallo v. Reno*, 931 F. Supp. 884, 892-93 (D.C. 1996) (fundamental fairness doctrine applied to promise to not deport the plaintiff where she "severely compromised her own safety by cooperating with the government,"

would be in danger if she were deported, and relinquished her right to a full hearing before the Immigration Judge as a result of the cooperation agreement); *see also Rowe v. Griffin*, 676 F.2d 524, 527–28 (11th Cir.1982) ("We believe that, as a matter of fair conduct, the government ought to be required to honor [an immunity] agreement when it appears from the record that: (1) an agreement was made; (2) the defendant has performed on his side; and (3) the subsequent prosecution is directly related to offenses in which the defendant, pursuant to the agreement, either assisted with the investigation or testified for the government.").

The Court does not necessarily find that Detective Cheek promised the Defendant immunity, but does find that under the circumstances, especially given the absence of advice related to her constitutional Miranda rights, the Defendant relied on Detective Cheek's assurances that she would be fine as long as she told the truth and understood his assertion that she was only being questioned as a witness to mean she would not be charged for any crime related to the conduct which was the subject of his questions. She gave incriminating answers which in fact form the very basis of this subsequent prosecution. The Government intends to use the statements against her and the Form 4473s which but for her incriminating statements would not be in evidence. The Court finds that the doctrine of fundamental fairness arguably applies.

At the very least, Detective Cheek's assurances to Defendant that she was fine, and she could answer truthfully without worrying about getting into trouble, should have been considered by the Magistrate Judge as coercive. *See Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 347-48 (1963) (describing long standing constitutional principle that prosecution must establish guilt by evidence independently and freely secured and not secured by coercion as reaching evidence induced from a person under a governmental promise of immunity; such evidence must be excluded), *see also cf., Santobello v. New York*, 404 U.S. 257, 262 (1971). (a plea resting in any significant degree on a promise can be said to be part of the inducement or consideration).

Instead, the Magistrate Judge's discussion regarding the voluntariness of her

statements hinged on whether it was coerced by either physical or psychological pressure. He concluded no because officers were calm and non-confrontation, i.e., nice to her, i.e., getting her water and tissues, letting her take a break, allowing her mother to come pick up the children, and because Detective Cheek at all time let her know that she was not a suspect, would not be in trouble for anything she might tell them about the suspect and what happened after the murder—they only wanted to question her as a witness. The Magistrate Judge did not consider the coercive effect Detective Cheek's assurances may have had in persuading her to answer his questions.

Essentially, the Magistrate Judge's conclusion that the interview was voluntary hinges on the fact that the Defendant admitted she agreed to answer questions, exercised her will by refusing to sign the back of the photograph of the suspect, and at the end of the recorded interview confirmed she had answered the questions voluntarily. He discounted the Defendant's young age, lack of education, and lack of experience with the criminal justice system as being commonplace and not so unusual to render the interview psychologically coercive.

The voluntariness of a statement requires consideration of the "totality of circumstances," which includes a person's age, education or intelligence, the length of detention, and the absence of advice to an individual about his or her constitutional rights. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). While the Magistrate Judge correctly found that she was not threatened with prosecution, and to the contrary, Detective Cheek testified that he assured her that he did not believe she was guilty in anyway related to the murder and that she was not in trouble. His tenor during the interview was that he was sympathetic to her and blamed her boyfriend for her problems, which he knew all about, and that she would be fine if she did the right thing and told the truth as a cooperating witness. To this extent, she was misinformed by Detective Cheek's assurances that she could speak truthfully without getting into trouble. These assurances were coercive, especially given the surroundings of the questioning, the length of detentions, her young age, lack of education, and the absence of advice to her about her

constitutional rights. This is not an issue of whether Defendant voluntarily waved her Miranda rights; she was not Mirandized-- Detective Cheek just asked her and she agreed to answer some questions. The Court finds her statements were not voluntary.

Moreover, the Fifth Amendment prevents the Government from using "statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966). As a result of *Miranda,* "whenever a person is in custody, she must be advised of her right to remain silent and her right to the presence of an attorney prior to commencing interrogation[1]."

Custody applies to circumstances that are generally thought to present a serious danger of coercion, such as in the circumstance of an arrest. "Even when a formal arrest has not occurred, a person may be in custody for purposes of *Miranda* if her freedom of movement is restrained to 'the degree associated with a formal arrest.'" (R&R at 9 (citations omitted). The question is an objective one: whether the setting is one from which a reasonable person would believe that she was not free to leave.

In conducting the objective or reasonable person inquiry, the Court considers: 1) the language used to summon the individual; 2) the extent to which the defendant is confronted with evidence of guilt; 3) the physical surroundings of the interrogation; the duration of the detention, and 5) the degree of pressure applied to detain the individual. (R&R at 9) (citing *Beraun-Panez,* 812 F.2d 578, 580 (9th Cir. 1987).

The facts relevant to the reasonable person analysis are as follows: Defendant knew she was being pulled over by an unmarked police car, with flashing lights. She

---

[1] The Government disputes that Detective Cheek's questions amounted to interrogation because his questions were not likely to elicit incriminating responses but were instead focused on his homicide investigation and she was not a suspect but merely a potential witness. This argument is disingenuous. Detective Cheek was a seasoned detective and knew the Defendant assisted the suspect in discarding the murder weapon. Detective Cheek should have known there were other ways in which she may have assisted the suspect. Once she divulged the murder weapon was hers, Detective Cheek should have known that further questions about how the guns got from her to the murder suspect would likely elicit incriminating responses. Nevertheless, he asked them and even extended questioning to other guns not at issue in his murder case.

pulled into the Quick Trip. She was approached by at least three plainclothes police officers. Detective Cheek identified himself and told Defendant he wanted to talk to her about an incident police were investigating. He told her she was fine, not in trouble, and that he just wanted to ask her a couple of questions. She agreed. Detective Cheek asked her to come to the police station to be questioned. She was not given another option. She was not allowed to drive her car there. She was told her car had to remain at the Quick Trip. She was told to contact her mother to come pick up her children. She was not allowed to wait for her mother to arrive but was transported in a police unmarked vehicle to the police station where she was placed in an interrogation/interview room. She was not handcuffed, but the door to the room was closed. Officers periodically checked on her and asked if she wanted anything to drink, etc. She was forced to wait for approximately 30 minutes before Detective Cheek arrived to question her.

While the language of the summons was benign, the police applied some degree of pressure to detain her. They seized her car, had her call her mother to pick up her children, transported her by police vehicle to the police station, where they placed her in an interrogation room with the door closed, made her wait for over 30 minutes, then questioned her for about two hours. The degree of pressure applied to detain the Defendant, the physical surroundings of the interrogation, and its duration, strongly suggest she was in custody.

While Detective Cheek asserted he repeatedly assured the Defendant that she was not a suspect and was only going to be questioned as a witness, the audio recording reflects that he began the questioning by telling her that they were aware that she was holding on to something that was hard to hold onto, trying to find a way to do the right thing, and so he wanted to talk to her to give her an opportunity to do the right thing. The initial questions were directed towards her identifying her boyfriend, then about when the suspect last borrowed her car, which was Easter Sunday, the day of the murder, and what happened on that day. She tells him she is afraid what she tells him will get back to her boyfriend, the murder suspect. Detective Cheek tells her that she can trust him; he has

1 | not told her where he obtained the information about her. He tells her that they already
2 | have information about the questions he is asking her; the information is already out
3 | there.

When asked to sign a photograph identifying her boyfriend, she becomes extremely upset; she refuses to sign the photograph and says I've given you pages of information. Her response suggested she was done cooperating. Detective Cheek takes a break and upon returning, he sternly advises her that she should not be covering for her boyfriend. He shows her the surveillance picture of her car at the murder scene and tells her, "You're protecting him, and he has caused you all kinds of problems—it's time for you to do the right thing." The Court concludes, like the Magistrate Judge did, that Detective Cheek did not confront her with guilt related to the murder, but he repeatedly advises her that he knows what she has done. He describes her boyfriend as causing her problems, which she can address by doing the "right thing," i.e., being a cooperating witness. The Court finds that psychological pressure was applied to secure the Defendant's statements.

Just because Defendant did not agree to sign the back of the photograph identifying her boyfriend does not show she felt free to get up and leave or stop answering Detective Cheek's questions. Considering all the relevant facts, this Court finds that a reasonable person would not have felt free to leave the police station. The Court finds that the Defendant was in custody when questioned and she was not Mirandized. Her incriminating statements are, therefore, suppressed.

This Court finds the Defendant was in custody and not Mirandized and that her statements were not voluntary. The Court grants the Motion to Suppress.

///
///
///
///

**Accordingly,**

**IT IS ORDERED** that the Report and Recommendation (Doc. 55) is not adopted.

**IT IS FURTHER ORDERED** that the Motion to Suppress (Doc. 43) is GRANTED.

Dated this 22nd day of January, 2018.

_____
Honorable David C. Bury
United States District Judge